United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 17, 2005**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 7, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-50691

---

BRADLEY GUILE, Individually and
as representative of the Estate
of Emiko Guile and all her
wrongful death beneficiaries,

                    Plaintiff-Appellant,


        versus


UNITED STATES OF AMERICA,


                    Defendant-Appellee.

-------------------------------------------------------------------

BRADLEY GUILE, Individually and
as representative of the Estate
of Emiko Guile and all her
wrongful death beneficiaries,

                    Plaintiff-Appellant-Cross-Appellee,

versus

UNITED STATES OF AMERICA, ET AL,

                    Defendants,

UNITED STATES OF AMERICA,

                    Defendant-Appellee,

CRISTINA CRUZ, MD,

---

Appeals from the United States District Court
for the Western District of Texas

---

Before GARWOOD, SMITH and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff Bradley Guile (Guile) appeals the district court's dismissal of his claims against the United States under the Federal Tort Claims Act (FTCA) and the court's granting of defendant Cristina Cruz's motion for judgment as a matter of law regarding liability for the death of Guile's wife. We affirm.

**Facts and Proceedings Below**

Guile's wife, Emiko Guile, was admitted on May 12, 1998 to an inpatient psychiatric ward for military dependents and retirees at William Beaumont Army Medical Center (Beaumont) in El Paso, Texas. Beginning in 1991, Mrs. Guile had been seeing military doctors, including neurologists, psychiatrists, and psychologists, at various places that Guile was stationed because of problems including depression, anxiety, and an involuntary head movement. When she was admitted to Beaumont in May 1998, Mrs. Guile had been found unconscious at home by her four-year-old daughter and her husband after overdosing on her antidepressant medication. This was Mrs. Guile's second inpatient admission at Beaumont; she had been admitted in February 1998 for a few days, apparently for

2

severe anxiety and because she had expressed concerns that she would overdose on her medications.[1]

The United States Army had contracted with PHP Healthcare Corporation (PHP) to provide psychiatric services for dependents and retirees at Beaumont. The inpatient ward serving Mrs. Guile was therefore operated by PHP within the Army's Beaumont facility. Mrs. Guile's psychiatrist while she was admitted to the inpatient ward was Dr. Cristina Cruz, a part-time independent contractor with PHP. Dr. Cruz treated Mrs. Guile from May 13 until Tuesday, June 9, when she left for a few days' vacation. From June 9 through Friday, June 12, Dr. Cecilia DeVargas, another PHP contractor psychiatrist, covered for Dr. Cruz in treating Mrs. Guile. Beginning on the evening of June 12, Dr. Milton Anderson, an active duty Army officer and psychiatrist, was the on-call physician covering the inpatient ward for the weekend.[2]

On the morning of Sunday, July 14 Emiko Guile was found dead in her room. She had hung herself from a door hinge of an armoire in the room, using the belt from her bathrobe. Mrs. Guile was in a double-occupancy room with a roommate, and two large armoires were positioned between the two beds in the room. The armoires

---

[1]Mrs. Guile had also been a patient since January 1998 of Dr. Frank Giordano, PHP's medical director, in the outpatient psychiatric clinic run by PHP at Beaumont.

[2]The Army and PHP had an arrangement by which Army and PHP psychiatrists participated in a rotating on-call schedule for evenings and weekends. The on-call physician covered both the PHP-run inpatient psychiatric ward and an adjacent inpatient ward operated by the Army for active-duty military patients.

3

blocked the view from the room's doorway of most of Mrs. Guile's bed.  Although Mrs. Guile likely died soon after midnight, her body was not discovered until about 9:20 the next morning.  The nurse on duty during the night, Adree Rojas, had spent much of her shift asleep in a break room, without checking on Mrs. Guile.  The mental health technician, Mario Padilla, charged with checking on Mrs. Guile every thirty minutes also did not do so, although he marked her chart to indicate that he had.  Padilla also heard a banging noise from the direction of Mrs. Guile's room soon after midnight, but did not investigate.

On behalf of himself, his daughter, and his wife's estate, Guile sued the United States, Drs. Cruz and DeVargas, PHP, and some of PHP's nurses and technicians in the district court below.  The claims against the United States included claims based on premises liability and negligent contractor supervision and a claim based on negligence of Dr. Anderson.  At the close of evidence, the court granted a motion to dismiss the non-medical claims (referred to as the "premises liability" claims).  The court then instructed the jury that the United States could not be liable if the jury found that there was no doctor-patient relationship between Dr. Anderson and Mrs. Guile, and the jury did in fact find that there was no such doctor-patient relationship.

With regard to the non-government plaintiffs, the court instructed the jury that PHP, Adree Rojas, Mario Padilla, and Mrs. Guile herself were each negligent and a proximate cause of Emiko

4

Guile's death as a matter of law.  PHP had entered bankruptcy proceedings by this time, and its insurance company was in receivership.  The plaintiff had dismissed its claims against the other PHP nurses and technicians at the close of evidence.  The jury found that Dr. DeVargas was not liable for Mrs. Guile's death, but that Dr. Cruz and Bradley Guile were liable.  The jury awarded total damages of about $1.2 million, and attributed the liability 33% to PHP, 25% to Dr. Cruz, 20% to Mario Padilla, 15% to Adree Rojas, 5% to Emiko Guile, and 2% to Bradley Guile.

Dr. Cruz renewed with the district court the motion for judgment as a matter of law that she had made unsuccessfully at the close of the plaintiff's evidence and at the close of all evidence. The court agreed that there was not "sufficient evidence for the jury to find that Defendant Cruz's allegedly negligent acts or omissions were the proximate cause of Emiko Guile's death," and granted Dr. Cruz's motion for judgment as a matter of law.  Dr. Cruz's motions for a new trial and for remittitur were denied as moot.  Guile appeals the grant of Cruz's motion for judgment as a matter of law and the dismissal of the non-medical claims against the government.

## Discussion

### I.    *Standard of Review*

As with other questions of law, we review a grant of judgment as a matter of law *de novo*.  *Morante v. Am. Gen. Fin. Ctr.*, 157

5

F.3d 1006, 1009 (5th Cir. 1998). The jury's verdict can be overturned only if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* In evaluating this evidentiary basis, we view the evidence and inferences therefrom in the light most favorable to the party opposing the motion. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 572 (5th Cir. 2002). We review *de novo* the district court's granting of a motion to dismiss based on exceptions to the FTCA. *Jeanmarie v. United States*, 242 F.3d 600, 602 (5th Cir. 2001).

## II. Liability of Dr. Cruz

It has long been the law in Texas that a plaintiff in a medical negligence case must "prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged." *See, e.g.*, *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App.–Amarillo 2003); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993); *Bowles v. Bourdon*, 219 S.W.2d 779, 782 (Tex. 1949). For the alleged negligence to be a proximate cause of the harm, the harm must have been a foreseeable result of the negligence, and the negligence must have been "a substantial factor in bringing about the harm, and without which the harm would not have occurred."[3] *Archer*, 118

---

[3]The inquiry is sometimes described as a "reasonable medical probability" that the alleged negligence proximately caused the harm, but the ultimate standard is the same. *See Park Place*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at

6

S.W.3d at 782; *Park Place*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400. Because medical treatment is beyond the reach of a layperson's knowledge and experience, expert evidence is required to show both a breach of a standard of care and that the breach was a proximate cause of the harm suffered. *See Chambers v. Conaway*, 883 S.W.2d 156, 158 (Tex. 1993); *Bowles*, 219 S.W.2d at 782–83. In granting Dr. Cruz's motion, the district court concluded that Guile's expert had not established that any negligence on the part of Dr. Cruz was a proximate cause of Emiko Guile's suicide.

  *A. Breach of the standard of care*

  Guile argues that the testimony of his expert, Dr. George Meyer, did establish breaches of the relevant standard of care. The breaches that Guile contends were established are: improper drug dosing, lack of necessary suicide precautions, improper handling of test results, failure to re-evaluate the treatment plan, failure to transfer Mrs. Guile to another hospital, improper discussion of discharge with Mrs. Guile, improper sending of Mrs. Guile out on a pass, and failure to have the armoires removed from Mrs. Guile's room.[4]

  In the case of some of these alleged breaches, there is no evidence that Dr. Cruz committed the alleged act or omission,

400.

  [4]There were a few other breaches alleged at trial, but those listed here are the ones Guile briefs on appeal. The district court correctly concluded that there was insufficient evidence to find that Dr. Cruz committed any other breaches that were a proximate cause of Mrs. Guile's death.

whether or not such act or omission would constitute a breach of the standard of care. For example, the expert's reference to discussion of discharge with Mrs. Guile involved acts of Dr. DeVargas, not Dr. Cruz. All evidence showed that Dr. Cruz continually re-evaluated and adjusted the treatment plan, including seeking of second opinions. Dr. Cruz did read the results of the testing she ordered, and discussed the results with the testing psychologist. There was no evidence that Dr. Cruz had anything to do with any subsequent unavailability of the test results. Mrs. Guile's charts showed that Dr. Cruz did increase the dosages of medication over time, as Dr. Meyer testified was necessary to meet the standard of care.

Furthermore, there was no evidence that Dr. Cruz knew about the armoires in Mrs. Guile's room. Dr. Cruz testified that she had not been in Mrs. Guile's room and did not know about the furniture, and there was no evidence that she had been in the room. Guile argues that there was sufficient circumstantial evidence for the jury to infer that Dr. Cruz had seen the armoires or should have seen them.[5] Inferences drawn from circumstantial evidence must be reasonable inferences, however. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 (5th Cir. 1996); *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 308 (5th Cir. 1989). An inference that Dr. Cruz

---

[5]A nurse testified that it was "no big deal" for a doctor to go into a patient's room, but did not specifically recall having seen Dr. Cruz do so. There was also testimony that the nurse's station was close enough to Mrs. Guile's room that the furniture could be seen from there.

should have noticed the furniture in Mrs. Guile's room because it may have been possible to see the furniture from the nurse's station is not a reasonable inference in view of evidence that (1) her practice was to see patients in her office, and (2) the arrangement of patient rooms was not her responsibility (so that there would be no reason for her to be looking at the patient rooms while at the nurse's station). Such an inference would be "mere speculation and conjecture," which is not sufficient to support a jury verdict. *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583–84 (5th Cir. 2002)(concluding that testimony showing ways in which it was possible that an oil drilling operation contaminated an aquifer was not sufficient to allow an inference that the operation actually did so). Dr. Cruz can of course not be held liable for these acts or omissions that she was not shown to have committed.

For most of the remaining alleged breaches, there was not substantial evidence that these were actually breaches of the relevant standard of care, where the standard of care is that of a psychiatrist exercising ordinary care. Although Dr. Meyer testified that he would have used higher dosages on Mrs. Guile's medications, he agreed that Dr. Cruz's adjustment of the medications met the standard of care. With regard to transferring Mrs. Guile to another hospital, Dr. Meyer at one point said that transfer to a facility having electroconvulsive therapy (ECT) capability would be appropriate, but he later conceded that ECT was

9

not required to meet the standard of care and might be inappropriate in some cases. Dr. Meyer's statement that Mrs. Guile should have been transferred to a safer facility was a reference to the lassitude of Rojas and Padilla, which was not foreseeable to Dr. Cruz. In the case of suicide precautions, Dr. Meyer at one point asserts that Dr. Cruz did not properly maintain suicide precautions, and at another point allows that the ongoing suicide assessments of Mrs. Guile met the standard of care.

Guile argues that the district court was incorrect in concluding that Dr. Meyer had retracted his statements asserting that Dr. Cruz breached the standard of care. He argues that Dr. Meyer instead created "contradictions" the resolution of which is the province of the jury. We must remember, however, that evidence sufficient to support a jury verdict must be *substantial* evidence. *Anthony*, 284 F.3d at 583. An expert's opinion must be supported to provide substantial evidence; "we look to the basis of the expert's opinion, and not the bare opinion alone." *Archer*, 118 S.W.3d at 782. "A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness." *Id.* (footnote omitted). Many of the alleged breaches described above come from statements of Dr. Meyer that are unsupported by any data (such as studies evaluating treatment techniques), in addition to being later contradicted by him, or to be nothing but his incorrect factual assumptions based on examination of incomplete records. The contradictions coupled

10

with the lack of support for the statements take them out of the realm of substantive evidence. In the context of admissibility of expert testimony, this court has noted that "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

### B. Proximate cause

Even to the extent Guile could establish any breaches of the standard of care, there can be no liability unless such breaches are shown to be a proximate cause of Mrs. Guile's death. For example, Dr. Meyer did testify to a belief that Dr. Cruz breached the standard of care when she allowed Mrs. Guile to go on a pass with her family on May 28. This was arguably contradicted by his later testimony acknowledging that Mrs. Guile's passes appeared to make her feel better, but even if we assume that the pass was a breach of the standard of care, there can be no liability from this breach because Dr. Meyer testified that the pass was not a cause of Mrs. Guile's death.

Similarly, there is no expert evidence establishing that any of the alleged breaches by Dr. Cruz were a proximate cause of Mrs. Guile's suicide. Evidence of proximate cause must show that in the absence of the alleged breach the harm would not have occurred, and must state, describe or explain the connection between the breach and the harm in sufficient detail to support the expert's assertion

11

of proximate cause. *See, e.g.*, *Bottoms v. Smith*, 923 S.W.2d 247, 251–52 (Tex. App.–Houston 1996) (holding that fact issue existed as to proximate cause when expert opined that polyp would more likely than not have been diagnosed if omitted test had been done, that polyp diagnosed at that time would more likely than not have been at cancer stage having an 88% or better survival rate, and that delay in diagnosis resulted in a cancer stage having a 0% survival rate).

Dr. Meyer's statements regarding the causes of Emiko Guile's suicide do not provide a sufficient connection between any alleged breaches of Dr. Cruz and Mrs. Guile's death. There was no expert testimony that any one or more alleged breaches of care by Dr. Cruz caused Emiko Guile's death. As noted in Guile's brief, Dr. Meyer stated generally that "in totality" *all* breaches by *all* the multiple actors involved combined to cause Mrs. Guile's suicide.[6] These unexplained, conclusory statements do not establish proximate cause for any particular breach or combination of particular breaches by Dr. Cruz, because they do not describe or state how any particular asserted breach or breaches by Dr. Cruz related to the

---

[6]Acts and omissions by other actors that were brought up during the trial as potential causes include: Rojas's sleeping during her shift; Padilla's failure to check on Mrs. Guile; an unidentified nurse or technician's failure to confiscate Mrs. Guile's bathrobe belt; a June 9 meeting regarding discharge planning that upset Mrs. Guile and her husband; Guile's failure to take Mrs. Guile out on her usual Saturday pass June 13 or to acknowledge their June 12 wedding anniversary; Guile's June 13 argument with Mrs. Guile in which he reiterated that he would not let her come home until she was well; Dr. Anderson's June 13 assignment to Mrs. Guile to prepare a time line of events in her life; and placement by unidentified personnel of the armoires in Mrs. Guile's room.

12

suicide and do not state that without Dr. Cruz's alleged breach or breaches the suicide would not have occurred.  This is especially so in that several asserted deficiencies which Dr. Meyer *assumed* were attributable to Dr. Cruz were shown by uncontradicted evidence either not to have occurred at all or not to have been attributable to Dr. Cruz (and the others were essentially withdrawn by Dr. Meyer).[7]  The same is true for Dr. Meyer's generalized statements that Mrs. Guile's illness was treatable or that her suicide was preventable.  Dr. Meyer further testified that  he could not guarantee within a reasonable degree of medical probability that Mrs. Guile would not have committed suicide on June 14, 1998 even if she had received the care that he testified was appropriate.

Because Guile did not establish by expert testimony any negligence on the part of Dr. Cruz that was a proximate cause of Emiko Guile's suicide, the district court was correct in granting Dr. Cruz's motion for judgment as a matter of law.

### III. *Dismissal of Claims Against United States*

Guile argues that the district court erred in applying the discretionary function exception to the FTCA to dismiss his non-

---

[7]This was in contrast to several particular acts or omissions of others than Dr. Cruz which Dr. Meyer individually identified as a cause of Mrs. Guile's death.  For example, Dr. Meyer agreed that "regardless of everything that occurred. . . Mrs. Guile would not have died but for Mario Padilla not doing his job that night" and that "the nursing staff [having] allowed the belt on the ward" was one of "[t]he three most important factors in Emiko Guile's suicide," the other two being "Mrs. Guile's failure to listen to the allied help" and "the milieu . . . of PHP on II West . . . the environment of lisisity [explained as "lassitude"]."  Also, ". . . the last straw was her phone conversation with her husband in which he said you're not coming home until you are better."

medical claims against the United States.  The United States has sovereign immunity from suit except as it waives this immunity by consent.  *United States v. Sherwood*, 61 S.Ct. 767, 769 (1941).  One example of such a waiver is the FTCA, which provides that the United States may be sued "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).[8]

There are multiple exceptions to liability of the United States under the FTCA, however, one of which is known as the discretionary function exception.  Liability under the FTCA does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. §

---

[8]28 U.S.C. § 1346(b) provides:
"(1) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
(2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or any agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of a physical injury."

14

2680(a).[9]  The Supreme Court has described the purpose of the discretionary function exception as being to protect policy-based legislative and administrative decisions from "judicial 'second-guessing.'" *United States v. Varig Airlines*, 104 S.Ct. 2755, 2765 (1984); *United States v. Gaubert*, 111 S.Ct. 1267, 1273 (1991).

Guile argues that the United States failed to properly supervise PHP, failed to provide safe premises, failed to protect the safety of hospital patients, and failed to ensure that PHP had the malpractice insurance required by its contract with the Army.[10] Guile's reasons for arguing that the discretionary function exception does not apply to these claims appear to be that (1) when the government retains safety oversight authority over a contractor, enforcement of safety obligations is not a discretionary function; (2) that medical judgments are not covered

---

[9]28 U.S.C. § 2680 provides in relevant part:
"The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
. . . ."

[10]Guile does not appear to argue that the United States should be liable for the breaches of PHP personnel, apart from liability for its own alleged breaches.  This vicarious liability would be barred by the independent contractor exception to the FTCA.  *See Broussard v. United States*, 989 F.2d 171, 175 (5th Cir. 1993).  A retained right of inspection does not defeat the independent contractor exception unless the government actually supervises the contractor's day-to-day activities.  *See Williams v. United States*, 50 F.3d 299, 306–07 (4th Cir. 1995); *Brooks v. A.R. & S. Enters., Inc.*, 622 F.2d 8, 12 (1st Cir. 1980).

by the discretionary functions exception; and (3) that the government's negligence in this case was too egregious to be rooted in the policy considerations that the discretionary function exception is intended to protect.

Guile cites a Ninth Circuit case holding the United States liable for injuries to workers on a post office construction project. *Camozzi v. Roland/Miller & Hope Consulting Group*, 866 F.2d 287 (9th Cir. 1989). The workers were injured falling through uncovered openings in metal decking. *Id.* at 288. In its contract with the construction contractor, the Postal Service specifically required that metal deck openings be covered, and a contract with a company hired to supervise construction required daily inspections of 35 listed items, including "floor openings." *Id.* at 288-89. The court held that the Postal Service's negligence in not discovering and remedying the uncovered openings was not a policy choice warranting protection by the discretionary function exception but rather "a failure to effectuate policy choices already made and incorporated in the contracts." *Id.* at 290.

Other courts have distinguished *Camozzi* and held that the discretionary function exception did apply in cases where contracts were less specific regarding the safety violations proscribed and the mechanics of the inspection authority retained by the government. *See Clark v. United States*, 805 F. Supp. 84, 88-89 (D.N.H. 1992); *Moody v. United States*, 753 F. Supp. 1042, 1055

16

(N.D.N.Y. 1990). The contract between the Army and PHP includes a general requirement that "contractor personnel shall comply with all safety procedures and practices associated with the facility," but has no specific safety requirements for patient rooms. Moreover, the government "inspections" authorized by the contract refer to inspections of services provided, not of facilities, and are to be accomplished through review of medical records and procedures. We do not believe that this contract language creates a nondiscretionary duty on the part of the government to ensure the safety of patient rooms in the PHP-operated inpatient ward.

Guile's argument that governmental medical judgments are not covered by the discretionary function exception is not applicable to his claims against the government, since the claims do not involve governmental medical judgments at all. Dr. Anderson is the only government employee who could have applied any medical judgment with respect to Emiko Guile, and Guile does not appeal the jury's finding that he incurred no liability because there was no doctor-patient relationship. Guile's argument that the government's negligence was too egregious to be protected by the discretionary function exception appears to be in reference to the government's alleged failure to ensure that PHP had insurance. There are cases denying application of the discretionary function exception when extreme negligence was exhibited by government employees, on the theory that such negligence could not be grounded

17

in any legitimate policy consideration. *See Glickman v. United States*, 626 F. Supp. 171, 175 (S.D.N.Y. 1985); *Orlikow v. United States*, 682 F. Supp. 77, 82 (D.D.C. 1988) (both involving CIA drug experiments on unwitting subjects). Even if we assume that hiring an uninsured contractor constitutes this degree of negligence, there was no evidence presented that PHP was uninsured, much less that the government was aware of such a situation.

Guile's claims against the United States largely involve negligent supervision of PHP, with respect to either safety in patient rooms or insurance coverage. Supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function. *Kirchmann v. United States*, 8 F.3d 1273, 1276–77 (8th Cir. 1993). Similarly, a decision to hire a contractor and the choice of contractor are policy-based discretionary decisions. *Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995). To the extent that Guile claims that one or more United States employees were involved in placement of the armoires in Mrs. Guile's room,[11] this is also a discretionary function involving balancing of considerations such as patient safety, patient privacy, and patient convenience with regard to storage space. There was no evidence presented of a statute,

_____

[11]The trial record does not reveal exactly how or when the armoires got into Mrs. Guile's room. There was testimony that PHP's head nurse learned that the units were available and expressed interest in obtaining them for the patient rooms. The armoires, like all of the furniture on the ward, were owned by the government, so it is possible that some government employee approved transfer of the armoires to PHP's use, or even helped to move or place them.

regulation or policy giving specific direction as to any of these functions in a way that would make them non-discretionary.[12]  *See* *Gaubert*, 111 S.Ct. at 1273 (act is non-discretionary if a "'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow'").

Because the complained-of actions by the United States were discretionary functions, the district court was correct to dismiss Guile's non-medical claims against the United States under the discretionary function exception to the FTCA.  The United States therefore cannot be liable for torts that would otherwise apply in Texas, and we do not reach Guile's arguments regarding Texas premises liability law.[13]

**Conclusion**

For the foregoing reasons, the judgment of the district court is

AFFIRMED.[14]

---

[12]Guile points to a "Patient's Bill of Rights" issued by Beaumont which includes a patient's right to care and treatment "in a safe environment."  This vague statement does not sufficiently prescribe any particular course of action that it would remove the government's discretion in respect to the PHP contract.

[13]Guile argues that "if the discretionary function exception does not apply," the United States would be liable under Texas "premises liability" law.

[14]Dr. Cruz cross-appealed the district court's failure to conditionally rule on her alternative motion for new trial filed with her post-verdict motion for judgment as a matter of law as required by FED. R. CIV. P. 50(c)(1), requesting that, in the event we do not affirm the judgment of the district court in her favor, we alternatively remand to the district court to rule on her motion for new trial.  As we affirm the district court's judgment in favor of Dr. Cruz, we dismiss her conditional cross-appeal as moot.