# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2011

No. 10-51106

Lyle W. Cayce
Clerk

TOMAS RIVAS LOPEZ, Individually and as Representative of the Estate of Julio Adalberto Rivas Parada, Also Known As Juan Carlos Montano-Parada; MARIA ISABEL PARADA DE RIVAS, Individually and as Representative of the Estate of Julio Adalberto Rivas Parada, Also Known As Juan Carlos Montano-Parada,

Plaintiffs - Appellants

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; ASSISTANT SECRETARY JULIE MEYERS; DIVISION OF IMMIGRATION HEALTH SERVICES; GENE MIGLIACCIO, Director of the Division of Immigration Health Services,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:08-CV-38

Before JONES, Chief Judge, HAYNES, Circuit Judge and ENGELHARDT, District Judge.* **

EDITH H. JONES, Chief Judge:

---

* District Judge, Eastern District of Louisiana, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-51106

Appellants sued the United States under the Federal Tort Claims Act ("FTCA") alleging theories of negligence and constitutional violations in connection with Julio Adalberto Rivas Parada's death in federal custody. The district court dismissed Appellants' claims for lack of subject-matter jurisdiction pursuant to the FTCA's discretionary function exception. We AFFIRM.

## I. BACKGROUND

**Parada's Detention**

The material facts are undisputed. In May 2006, thirty-two-year-old Julio Adalberto Rivas-Parada and his brother illegally entered the United States by wading across the Rio Grande. Parada had already been hospitalized in Mexico during their journey. Near Carrizo Springs, Texas, Parada grew too weak to continue and the two stopped at a ranch to turn themselves in. Border Patrol agents took them into custody. On intake, the Val Verde Correctional Facility medically screened Parada. The facility found no medical problems aside from a positive initial tuberculosis test.

Parada pled guilty to misdemeanor illegal entry and was sentenced to 90 days in prison. The court remanded Parada and his brother to the United States Marshal Service's ("USMS") custody. The USMS transferred them to the Crystal City Correctional Center ("CCCC"). CCCC initially segregated Parada pending follow-up tuberculosis testing, which came back negative. Three days later, Parada sought treatment in the CCCC medical clinic for diarrhea, vomiting, muscle aches, and general weakness. He was given Pepto Bismol for his symptoms.

Parada's symptoms continued, and he was unable to eat or retain fluids. When Parada complained again of his symptoms a week later, a nurse, in

2

No.  10-51106

consultation with a doctor, treated Parada with an antiemetic and antibiotics. Parada returned the next day with persistent vomiting and diarrhea.  Medical staff assured him that he had only begun a treatment regimen.  They instructed him to drink plenty of fluids and to return in two days if his symptoms did not abate.

Parada's condition worsened.  Parada suffered a seizure the next day and developed borderline low blood pressure.  A medical technician treated both on consultation with a nurse, who instructed Parada to drink more fluids and make an appointment during sick-call hours the next day.  Near 3:30 A.M. on June 8, a correctional officer found Parada in his cell, too weak to move and complaining of shortness of breath.  On-duty medical staff brought an oxygen tank and requested authorization to send Parada to the emergency room.  CCCC doctors authorized Parada's departure at about 4:20 A.M.

CCCC personnel transported Parada to the hospital.  On arrival an hour later, emergency room staff noted Parada's ongoing vomiting and his inability to eat, his borderline low blood pressure, and signs of severe malnutrition. Emergency medical personnel treated Parada to no avail.  He died at 7:15 A.M. of a heart attack precipitated by a fatal electrolyte imbalance from his malnutrition, diarrhea, and vomiting.

**Prison Regulations At Issue**

The USMS housed Parada at CCCC pursuant to an Intergovernmental Service Agreement ("IGA") with Crystal City, Texas, executed in 2003.  The USMS had housed prisoners at CCCC for some time before the IGA.  An IGA is a formal written agreement between the USMS and a local or state government for the housing, care, and safekeeping of federal prisoners in exchange for a fixed

3

No.  10-51106

per diem payment by the USMS for each prisoner held.  The City in turn contracted with BRG Security Services, Inc. ("BRG") for CCCC's day-to-day operational management.

USMS policies at the commencement of the contract required an initial facility inspection upon an IGA award, supplemented by annual facility inspections.  U.S. MARSHALS SERV., POLICY DIRECTIVES § 9.26(A)(3)(a) (2006) (listing "Detention Facility Contracting Policy and Procedures" including facility inspections).  These policies — labeled "Directives" — required "an initial on-site inspection of detention facilities to determine the facility's level of compliance with USMS inspection guidelines."  *Id.* at § 9.26(A)(3)(a)(5).  The USMS supplemented these inspection requirements with a Jail Inspection Pilot Program, which, for the 21 states whose jail standards met or exceeded USMS minimum standards, accepted annual copies of local regulatory inspections in lieu of an IGA facility inspection.  Memorandum from Eduardo Gonzalez, Dir., U.S. Marshals Serv., to U.S. Marshals Serv., Jail Inspection Pilot Program (Aug. 4, 1994).  Nonetheless, the pilot program noted the continuing necessity of an initial inspection following an IGA award.  *Id.*

The USMS pilot inspection program accepted Texas jail standards.  The Texas Commission on Jail Standards ("TCJS") regularly inspected CCCC and calculated its maximum capacity at 515 prisoners.  The USMS accepted TCJS inspection reports in monitoring CCCC's compliance with both USMS and IGA standards.  TCJS certified CCCC's compliance with state jail standards for 2004 and 2005, but CCCC failed minimum standards in November 2006, after Parada's death.

4

No.  10-51106

The USMS has established custodial healthcare standards.  USMS policy is to "ensure that all USMS prisoners receive medically necessary health care services while ensuring that federal funds are not expended for unnecessary or unauthorized health care services."  U.S. MARSHALS SERV., POLICY DIRECTIVES § 9.15(C)(1) (2006).  USMS policy authorizes the acquisition of, and payment for, "reasonable and medically necessary care (including emergency medical care)" "upon recommendation of a competent medical authority or physician," and requires immediate provision of emergency medical care.  *Id.* at § 9.15(C)(2). USMS policy defines "emergency medical care" as "[m]edical care immediately necessary to preserve the life, health, limb, sight[,] or hearing of the prisoner." *Id.* at § 9.15(C)(17)(c).  Deputy marshals generally must pre-approve outside general medical care to USMS prisoners, but when prisoners are transported for emergency medical care, the USMS must only be notified "as soon as possible." *Id.* § 9.15(C)(7).  The IGA requires the City to provide federal prisoners with the same level of medical care as local prisoners.  The City must also provide 24-hour emergency medical care for prisoners.

**Proceedings**

Appellants sued BRG and its affiliates, and federal entities and officials. Appellants settled their BRG-related claims.  The United States was substituted for the federal defendants.  Appellants' second amended complaint asserted numerous theories of negligence, including failures to provide or to ensure the provision of medical care, to oversee operation of the CCCC in accordance with USMS standards, to comply with TCJS capacity standards, to investigate Parada's death, and to provide constitutionally sufficient policies governing prisoner medical care.

5

No.  10-51106

Following some discovery, the United States moved for summary judgment, asserting that the FTCA barred each of Appellants' claims under either the independent contractor or discretionary function exemptions.  The district court considered the motion as a Rule 12(b)(1) motion to dismiss for want of subject-matter jurisdiction and concluded the Appellants could not state a facially plausible negligence claim that arose from a non-discretionary function.  The court accordingly dismissed Appellants' FTCA claims.

Appellants now rely on two of their negligence theories as falling outside the scope of the discretionary function exception.  They assert that USMS policies obliged the USMS to inspect CCCC, rendering the negligent failure to inspect the facility a violation of a non-delegable, non-discretionary duty.  They also claim USMS policies mandated the USMS to ensure adequate medical care, and that the USMS's failure to monitor CCCC's operation violated these non-discretionary policies.  Alternatively, Appellants argue that Parada's constitutional rights were violated by inadequate medical care, and that the discretionary function exception necessarily excludes any discretionary decisions made in violation of the Constitution.

## STANDARD OF REVIEW

This court reviews *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, applying the same standard as the district court.  *Spotts v. United States*, 613 F.3d 559, 565 (5th Cir. 2010).  The party asserting jurisdiction bears the burden of proof of demonstrating jurisdiction.  *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009).  A complaint should be dismissed for lack of subject-matter jurisdiction when "it appears certain that the plaintiff cannot prove a plausible

set of facts that establish subject-matter jurisdiction." *Id.* In determining whether it has jurisdiction, the court may consider: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Id.* at 649-50.

## DISCUSSION

The United States, as sovereign, is immune from suit without its express consent. *Hebert v. United States*, 438 F.3d 483, 487-88 (5th Cir. 2006). This immunity deprives the court of subject-matter jurisdiction over claims against the United States. *Id.* Through the FTCA, Congress has consented to suit against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1).

"The liability of the United States under the FTCA, however, is subject to various exceptions contained in 28 U.S.C. § 2680, including the 'discretionary function' exception." *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010). The discretionary function exception withdraws the FTCA's waiver of sovereign immunity for actions "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* (quoting 28 U.S.C. § 2680(a)).

Under the Supreme Court's *Gaubert* test, a governmental employee's conduct must satisfy two conjunctive criteria to qualify as a discretionary function. *United States v. Gaubert*, 499 U.S. 315, 322-23, 111 S. Ct. 1267, 1273-

No.  10-51106

74 (1991).  First, the challenged conduct must be "discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" *Id*. at 322.  If so, we must examine if the conduct is also "of the kind that the discretionary function exception was designed to shield." *Id*. at 322-23.  The exception protects "actions and decisions based on considerations of public policy," including "decisions grounded in social, economic, and political policy." *Id*. at 323.  When, however, a governmental agent violates a *nondiscretionary* federal law, regulation, or express policy, a suit against the United States may go forward subject to other FTCA, state tort law, and procedural requirements.  *Id*. at 324.

Appellants seek to overcome the discretionary function exception by arguing the USMS violated its own nondiscretionary policies in both failing to inspect CCCC and failing to oversee the facility's medical care. Because the negligence claims derive from separate policies, we evaluate them separately.

Appellants first contend that various Directives required the USMS to inspect CCCC either immediately preceding or immediately following an IGA award.  An internal policy memorandum states that an institution "need[ed] to be inspected before the award of an IGA and subsequently inspected annually." Memorandum from Eduardo Gonzalez, Dir., U.S. Marshals Serv., to U.S. Marshals Serv., Jail Inspection Pilot Program (Aug. 4, 1994). Another USMS Directive requires the agency to "[c]onduct an initial on-site inspection of detention facilities to determine the facility's level of compliance with USMS inspection guidelines."   U.S. MARSHALS SERV., POLICY DIRECTIVES § 9.26(A)(3)(a)(5) (2006).  These documents allegedly articulate a nondelegable, nondiscretionary policy that the USMS breached by failing to inspect CCCC in 2003 when the IGA took effect.  Appellants emphasize the

8

No.  10-51106

USMS's use of the term "will" in these Directives as though it were dispositive of a nondiscretionary duty: the USMS *will* complete an inspection and *will* complete a form so documenting.

This view is oversimplified.  As this court has found, many policy statements  couched in seemingly mandatory language ultimately present only "generalized, precatory, or aspirational language that is too general to prescribe a specific course of action for an agency or employee to follow."  *Freeman v. United States*, 556 F.3d 326, 338 (5th Cir. 2009).  Thus, in *Freeman*, Department of Homeland Security policies stating where medical support "is required" following a disaster articulated only aspirational goals, although those policies allocated responsibilities to various agencies after a disaster.  *See id.* at 338-39. Even a statement that "federal support must be provided in a timely manner to save lives" constituted only "an *assumption*, not a specific directive." *Id.* at 339 n.12.  *Freeman* similarly concluded that the vast majority of a series of policy duties labeled "Correctional Statements and Accreditation" — which provided for methods for monitoring and auditing compliance — established only recommended standards.  *See Spotts*, 613 F.3d at 571, 571 n.10, 572.  That the USMS documents here in question state what the USMS "will" do is far from dispositive; "will" may be used to express a determination to commit a future act as easily as a command to perform that act.

Instead, the relevant inquiry is whether the policy specifically addresses how an official must confront a given situation.  *Freeman*, 556 F.3d at 339-40. A policy may direct general policy goals — such as determining a "facility's level of compliance with USMS inspection guidelines" — but when the policy fails to prescribe "specific direction" as to what course of action an employee must

9

No. 10-51106

follow, it generally fails to establish a nondiscretionary duty. *Guile v. United States*, 422 F.3d 221, 230-31 (5th Cir. 2005). Here, the USMS Directives provided no guidance, or even mention, on a variety of topics relating to this inspection obligation. Such issues include whether the grant of an IGA was to be contingent on a specific level of compliance, what minimum "level of compliance" (implying a continuum of potential compliance, and thus discretion vested in the USMS) a facility had to meet, and what remedial actions to take (if any) in the event of insufficient compliance with USMS guidelines. As to the "nondelegable" nature of the inspection requirement, USMS contends that it could rely on the TCJS annual inspections, which the JIPP expressly approved, to "override" the requirement of a pre-IGA inspection of CCCC. Memorandum from Eduardo Gonzalez, Dir., U.S. Marshals Serv., to U.S. Marshals Serv., Jail Inspection Pilot Program (Aug. 4, 1994). The CCCC satisfied the TCJS standards in 2004-05. The decisions how to conduct an inspection and whether to rely on annual state inspections, especially when taken against the backdrop of the facility's historical use in housing federal detainees, were imbued with policy and discretionary factors. Finally, the decision to retain a contractor is a policy-based discretionary decision. *Guile*, 422 F.3d at 231. For these reasons, the USMS inspection directive did not impose a "nondiscretionary" duty to inspect CCCC as opposed to merely mandating best practices before and after the award of an IGA.[1]

---

[1] But even if we assume the USMS directive imposed a nondiscretionary duty to inspect CCCC at the inception of an IGA award, and further assume USMS somehow breached the duty, Appellants had to allege facts that, if true, would demonstrate a plausible causal relationship between the nondiscretionary duty and Parada's death. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796, 803 n.44 (5th Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973-74 (2007)). Here Appellants' claim fails.

10

No.  10-51106

Appellants rely on another section of the Directives to claim negligent oversight of medical care at CCCC.  USMS policy provided that "the USMS will ensure that all USMS prisoners receive medically necessary health care services," and that emergency services "will be provided" to all prisoners "immediately."  U.S. MARSHALS SERV., POLICY DIRECTIVES § 9.15(C)(1) (2006).  The Directives further noted that facilities "must meet . . . minimum conditions of confinement," which included "adequate emergency medical coverage . . . available 24 hours a day."  *Id.* at §§ 9.25(A), (A)(3).  We cannot perceive a *nondiscretionary* failure by the USMS.  This claim is controlled by our decision in *Guile*, *supra*, 422 F.3d at 231 ("Supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function.").

Appellants finally attempt to circumvent the discretionary function exception with regard to Parada's deficient medical care by describing the USMS's failure as a constitutional violation.  Appellants rely on a vacated panel opinion in *Castro v. United States* to assert that if the USMS's failure to oversee properly CCCC's provision of medical care violated Parada's constitutional rights, that failure cannot fall within the discretionary function exception.  *See Castro v. United States*, 560 F.3d 381, 390-91 (5th Cir. 2009), *rev'd en banc*, 608 F.3d 266, 268-69 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 902 (2011).  The *Castro* panel opinion has no precedential value.  In *Spotts, supra,* this court subsequently declined to determine whether a properly pled state law tort claim predicated on a decision that violates the Constitution may obviate the

---

If the USMS was obliged to inspect CCCC in 2003 upon its IGA award and to file attendant paperwork memorializing such an inspection, it is difficult to conceive of how such a failure plausibly led to Parada's death in 2006 from specific failures of medical care by CCCC's designees.

11

No.  10-51106

discretionary function exception.  We need not decide so here either.  Appellants' pleadings allege no more than negligence against federal officials and evidence no facts that, if proved, could support the deliberate indifference standard required for an Eighth Amendment claim.  Lacking any plausible basis for a constitutional violation by USMS, Appellants also lack grounds to argue for avoiding the discretionary function exception.

## CONCLUSION

Appellants' negligence claims rest ultimately on discretionary decisions by the USMS, the nature of which preclude potential federal tort liability under the FTCA.  Their constitutional claim fails to meet minimum pleading standards that might allow them to argue for FTCA liability.  We therefore AFFIRM the district court's dismissal of Appellants' claims.

**AFFIRMED.**

No. 10-51106

HAYNES, Circuit Judges, concurring in the judgment:

The facts of this case are tragic and horrific, but we are required to follow the law which does not provide a remedy against these Appellees under the facts as pleaded. The majority opinion reaches the correct result under the law, so I join in the judgment. However, I find it unnecessary to reach the question of whether the initial inspection requirement was a nondiscretionary duty. I agree with the reasoning of footnote one that Appellants failed to plead a plausible causal connection between the failure to comply with the arguably nondiscretionary duty to conduct an initial inspection and Parada's death.