# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 14, 2008

Charles R. Fulbruge III
Clerk

No. 05-11359

WAVELINQ, INC.; ET AL.,

Plaintiffs,

WAVELINQ, INC.,

Plaintiff–Appellee–Cross Appellant,

v.

JDS LIGHTWAVE PRODUCTS GROUP, INC.; JDS UNIPHASE, INC., formerly known as JDS FITEL, Inc.,

Defendants–Appellants–Cross Appellees.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:01-CV-1752

Before KING, GARZA, and OWEN, Circuit Judges.

PER CURIAM:[*]

Wavelinq, Inc. and Jim Seago (collectively Wavelinq) sued JDS Lightwave Products Group, Inc. and JDS Uniphase, Inc. f/k/a JDS Fitel, Inc. (collectively JDS) for royalties it alleged were owed under an asset purchase agreement. A jury returned a verdict in favor of Wavelinq, and all parties have appealed. The

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

district court erred in applying the Texas prejudgment interest rate, and we accordingly reverse and remand to the district court for further proceedings. In all other respects, we affirm the judgment of the district court.

I

Wavelinq, Inc. and its sole shareholder, Jim Seago, designed and manufactured a wavelength monitoring unit (WMU) for fiberoptic transmission systems. JDS purchased Waveling and its assets in exchange for cash, a job at JDS for Seago, and an "earn-out" provision. The earn-out provision stated that JDS would pay Seago seven percent of product sales each year for three years. The annual earn-out amounts were capped at $1,000,000, $1,500,000, and $2,500,000 respectively in the first, second, and third years for a total of $5,000,000. JDS was responsible for calculating how much it owed in earn-out payments within thirty days of the end of each year.

JDS failed to provide any earn-out statements to Waveling for the first two years. After the third year, JDS supplied a vague earn-out statement that itemized sales for each year: the statement merely listed a net revenue for each JDS location but did not identify what products were included in the calculations, the price of the units sold, how many units were sold, or to whom the units were sold. JDS does not dispute that it owes Waveling $897,773 as reflected in this earn-out statement, but JDS has not paid anything to Waveling because it argues that a portion of the contract does not require payment until any disputes are resolved.

Waveling sued JDS for breach of contract, claiming that JDS failed to include certain products in the earn-out statement and also left out a number of sales for the products that were included. The case was tried before a jury.

The jury charge was divided into two sections: liability and damages. The

2

section on liability asked whether JDS failed to comply with the Asset Purchase Agreement with regard to three separate categories: (1) "disputed products," products that Wavelinq contended were within the earn-out provision; (2) "undisputed products," products JDS had included within the earn-out but for which Wavelinq contended the sales amounts were understated; and (3) "earn-out statements," amounts reflected on JDS's yearly statements to Seago, which the parties agreed would be owed but disputed when payment was required. The second section asked the jury to assess damages for any of the three categories to which it had answered "yes" in the first section and presented a blank space for each of the three categories.

The jury found that JDS breached the agreement with regard to all three categories. The jury was apparently confused, however, in answering the damage questions. The jury initially returned a verdict allocating nothing for the first two categories, despite an affirmative answer to the liability questions, but it allocated $5,000,000 for the earn-out statements category, even though the parties agreed on the amount owed, $897,773.

The district court gave the jury additional instructions. The jury was instructed that they should leave the first two categories blank if they agreed with JDS, but if they agreed with Wavelinq, they should allocate the $5,000,000—the maximum amount under the Asset Purchase Agreement if all of the yearly caps were met—among all three categories. The district court specifically pointed the jury to two exhibits, one showing Wavelinq's model for damages and another showing the amount claimed for earn-out statements. The district court told the jury that if they agreed with Wavelinq, they should consult these exhibits, subtracting the damages for undisputed products and earn-out statements from the $5,000,000 cap to reach the amount available for disputed

products. The jury returned a second verdict, allocating $1,500,000 for disputed products, $750,000 for undisputed products, and $2,750,000 for earn-out statements. Following postverdict motions, the district court reduced the damages for earn-out statements to $897,773 for a total verdict of $3,147,773 in favor of Wavelinq. JDS appeals, and Wavelinq cross-appeals.

## II

JDS contends that it was entitled to judgment as a matter of law that none of the disputed products are included within the earn-out provision. We review a district court's denial of judgment as a matter of law de novo,[2] finding judgment as a matter of law appropriate when "a party has been fully heard on an issue . . . [and] a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[3] At issue are broadband wavelength lockers, narrowband wavelength lockers, lasers with integrated monitors–lockers, and integrated power monitors–channel monitors. Relatedly, JDS contends that it was error for the jury to determine whether the agreement had been breached by the failure to include disputed products in the earn-out statements.

Due to a choice of law clause in the Asset Purchase Agreement, Ontario law controls the agreement.[4] Under Ontario law, "[t]he cardinal rule of contract

---

[2] Anthony v. Chevron USA, Inc., 284 F.3d 578, 583 (5th Cir. 2002).

[3] FED. R. CIV. P. 50(a).

[4] Int'l Interests, L.P. v. Hardy, 448 F.3d 303, 306 (5th Cir. 2006) ("In diversity cases, a federal court must follow the choice of law rules of the forum state . . . ."). "The Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced . . . ." Id. at 306-07 (citing DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990)).

interpretation 'is that the court should give effect to the intention of the parties as expressed in their written agreement,' and where the intention of the parties 'is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement.'"[5]  The only outside evidence allowed is the commercial context of the contract "to show the purpose for which various contractual provisions were included."[6]

> The earn-out provision defined "product sales" as follows:

> "Product Sales" means wavelength monitoring or spectral analysis devices employed in Wavelength Division Multiplexing (WDM) network applications that are manufactured and sold by JDS and its subsidiaries and its successors (including successors by merger) as determined by calculating the gross invoiced amount less returns and other discounts (other than trade discounts and receivable discounts) as determined in accordance with GAAP.  For greater clarity, these "Products":
>> (1) will provide accurate measurements of optical performance parameters such as wavelengths, linewidths, intensity levels, noise floor and optical signal-to-noise ratio; and
>> (2) may incorporate, but are not limited to, grating, photodetector array and DSP (Digital Signal Processing) technologies.

Testimony at trial described the basic processes involved in fiberoptics transmission systems.  In the most basic fiberoptic transmission system, data is transmitted through fiberoptic cable with lasers.  A laser on one end will flash a light, and a receiver on the other end detects light pulses.  A basic fiberoptic

---

[5] Venture Capital USA Inc. v. Yorkton Sec. Inc., [2005] 75 O.R.3d 325, 333 (quoting KPMG Inc. v. Canadian Imperial Bank of Commerce, [1998] O.J. No. 4746).

[6] Prenor Trust Co. of Can. v. Kerkhoff Props. Inc., [1994] 21 Alta. L.R.3d 122, ¶ 16.

transmission allows a single channel of light.

A more advanced system can send multiple light waves through a single fiberoptic cable at the same time. The receiver unit is capable of identifying a large number of light pulses simultaneously, distinguished by their colors and reading data based on which discrete lights are on and off at certain times. This type of multicolored light transmission system is known as wavelength division multiplexing (WDM). Each light pulse within the WDM is referred to as a channel.

The color of the laser light is determined by the wavelength of the light pulses. Because a large number of colors can be broadcast at the same time over the same cable, the wavelengths need to be monitored to ensure that each signal is the proper color. JDS purchased a Wavelinq device that was a WMU. Wavelength monitoring is basically controlling the subtle shades of the laser colors. Channel monitoring and wavelength monitoring are interchangeable terms. The WMU also performs a power monitoring function that ensures that the lights from the laser are bright enough to reach the receiver on the other end of the fiberoptic network.

Another type of relevant technology is spectral analysis devices. These monitor the power levels at various individual wavelengths as opposed to the device as a whole.

The definition in the earn-out agreement lists a number of characteristics for "product sales." The devices must be "wavelength monitoring or spectral analysis devices employed in Wavelength Division Multiplexing (WDM) network applications." Thus they must either monitor the wavelength, color, and channel of the light or monitor power at wavelengths. They must also be used in WDM (multichannel) network applications.

The agreement further states that products "will provide accurate measurements of optical performance parameters such as wavelengths, linewidths, intensity levels, noise floor and optical signal-to-noise ratio; and . . . may incorporate, but are not limited to, grating, photodetector array and DSP (Digital Signal Processing) technologies" [emphasis added]. JDS argues that the list of five optical performance parameters is meant to be read as a requirement that a product perform all five measurements at the same time. The Wavelinq WMU is the only product that can measure all five parameters simultaneously (thus excluding all other products from the earn-out).

JDS bases its argument on the plural "s" attached throughout the definition. Paragraph 1.3 of the Asset Purchase Agreement states that "unless the context requires otherwise, words importing the singular include the plural and vice versa . . . ." Because the context does not demand otherwise, we impart no special meaning to the plural forms. The definition also states that the products will contain optical performance parameters "such as," suggesting that the list is demonstrative and not exhaustive.

The product may incorporate technologies like those listed. The word "may" suggests that these technologies can be utilized by the products but are not a necessary component. Additionally, the technologies are not limited to those listed, so the list is not necessarily exhaustive. JDS argues that because the listed components, in the listed order, are the core of the Wavelinq monitor design, they should be construed as being satisfied only by a Wavelinq monitor or similar design. Nothing in the definition requires that a design include all—or any—of the three listed components.

A wavelength locker is used in dense WDM transmission systems to stabilize the wavelength of the light pulses emitted by the lasers. The locker is

tuned to an individual channel, where it filters and detects a small amount of the laser light source and provides a stabilizing feedback signal to ensure that the source continues to emit the proper wavelength. JDS's product description for wavelength lockers stated that it was used in dense WDM systems to monitor channel frequency and optical power. Channel frequency is a synonym for channel wavelength, so the device functions as a channel wavelength monitor.

A locker is a one-channel-at-a-time device—if a fiberoptic cable contains eighty channels, it will require eighty lockers. Narrowband and broadband lockers are different only in packaging—companies could either purchase all of the lockers they needed as a broadband locker unit with one product number for multiple lockers or as a narrowband unit with individual product numbers for each locker. The lockers were offered in this manner for the ease and choice of the purchasing company depending on their administrative needs.

JDS did not include any locker sales on the earn-out statement it provided to Waveling, arguing that lockers do not fall under the product definition. First, JDS contends that because an individual locker focuses on a single wavelength, it could not work with a multichannel signal and therefore does not fall within the definition. This analysis assumes that a single product must be capable of monitoring a multichannel signal, yet there is no such requirement in the definition of "product sales." The definition merely requires that a product be used in WDM network applications, and a series of lockers can be combined to monitor all available wavelengths within a WDM network.

Second, JDS argues that because lockers were available at the time of the agreement, they should not be included in the earn-out. Nothing in the agreement excludes preexisting products. Further, two of the undisputed products that JDS included in the earn-out statement, OPM and Queensgate,

existed at the time of the agreement.

Under the product definition, lockers are wavelength monitoring devices that are employed in WDM network applications. They measure wavelength, linewidth, and intensity levels. Though they do not contain grating or DSP, they contain something similar to a photodetector array: each locker contains two photodetectors, so the combination of the necessary amount of lockers for use in a WDM network will yield a large number of photodetectors, similar to a photodetector array. The narrowband and broadband lockers are not explicitly excluded by the product definition.

JDS also argues that lasers with integrated monitors do not fall within the product definition. Its argument is based on the assumption that the definition is meant to only include Wavelinq's WMU and similar designs. The integrated units are dissimilar to the Wavelinq WMU.

The integrated products are created by packaging a monitor or locker with a laser or other network application. The laser channel monitor–locker is sold as a combined unit that provides a monitor or locker to control the laser and is a type of wavelength monitor. The integrated power monitor–channel monitor is used to monitor individual transmission channels or laser powers. It is a type of spectral analysis device because it measures power over channels. Both integrated products are designed for use in WDM network applications. Each measures a number of the optical performance parameters. The integrated products contain the necessary features to possibly fall under the product definition.

The agreement defines products through illustrative lists of technologies and features that are explicitly nonexhaustive. The agreement requires only that the product either monitor the wavelength, color, and channel of the light

or monitor power at wavelengths, be used in WDM network applications, and provide accurate measurements of optical performance parameters. The district court did not err in failing to hold, as a matter of law, that the disputed products were excluded from the earn-out provisions. For the same reason, any error in submitting to the jury whether the disputed products were "products" under the Asset Purchase Agreement was harmless as to JDS.

## III

Both parties lodge a myriad of complaints concerning the jury's verdict and the district court's subsequent supplemental instructions and resubmission to the jury; however, neither party objects to the original jury charge. Wavelinq argues that the district court should have entered judgment on the first verdict in its favor for $5,000,000. JDS argues that the supplemental instructions tainted the jury's deliberations. We conclude that the district court did not err in resubmitting the case to the jury and that the accompanying supplemental instructions were not an abuse of discretion.

## A

The practice of resubmission to the jury for clarification when the verdict is conflicting is well-established. Federal Rule of Civil Procedure 49(b) explicitly allows a district court to "direct the jury to further consider its answers and verdict" when the answers to interrogatories are inconsistent with the general verdict or each other.[6] Rule 49(a), which concerns special verdicts, does not explicitly provide for resubmission to the jury. However, we have held that special verdicts, such as the one involved in this case, should be treated the same

_____

[6] FED. R. CIV. P. 49(b).

because Rule 49(a) does not prohibit resubmission of inconsistent verdicts and it has long been the practice of this circuit.[7] The majority of circuits agree.[8] The Ninth Circuit noted that it "promotes both fairness and efficiency."[9]

In University Computing Co. v. Lykes–Youngstown Corp., we held that "the trial court had the authority to request the jury to correct its verdict."[10] In that breach of contract and misappropriation action, the jury awarded punitive damages for misappropriation and conversion but did not award actual damages on those counts.[11] The defendants argued that because the jury did not award any actual damages, the initial verdict amounted to a finding of no injury with respect to those counts.[12] In rejecting that argument, we noted that although the problem has "arisen infrequently," courts have generally held that "a trial court may order a jury to continue its deliberation if the verdict is contrary to the

---

[7] Nance v. Gulf Oil Corp., 817 F.2d 1176, 1178 (5th Cir. 1987) (citing Perricone v. Kansas City S. Ry. Co., 704 F.2d 1376, 1379 (5th Cir. 1983); Guidry v. Kem Mfg. Co., 604 F.2d 320, 321 (5th Cir. 1979); Fugitt v. Jones, 549 F.2d 1001, 1005 (5th Cir. 1977); Morrison v. Frito-Lay, Inc., 546 F.2d 154, 160-61 & n. 10 (5th Cir. 1977); and Landry v. Offshore Logistics, Inc., 544 F.2d 757, 761 (5th Cir. 1977)).

[8] See Mateyko v. Felix, 924 F.2d 824, 827 (9th Cir. 1991); Karl v. Burlington N. R.R. Co., 880 F.2d 68, 72-73 (8th Cir. 1989); Santiago-Negron v. Castro-Davila, 865 F.2d 431, 444 (1st Cir. 1989); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 890-91 (2d Cir. 1988). But see McCollum v. Stahl, 579 F.2d 869, 871 (4th Cir. 1978) (holding that a resubmission was an abuse of discretion because "the remand of the questions to the jury was tantamount, in its effect, to a direction to the jury to find liability in order to warrant the award of damages").

[9] Mateyko, 924 F.2d at 827.

[10] 504 F.2d 518, 547 (5th Cir. 1974).

[11] Id. at 546.

[12] Id.

court's instructions"[13] or "if the jury returns two inconsistent verdicts."[14]

Wavelinq argues that resubmission was neither appropriate nor necessary because it was clear that the jury's intent was to award $5,000,000. Wavelinq contends that the district court should have reapportioned the damages among the three categories such that Wavelinq was awarded $5,000,000. Wavelinq cites a number of authorities where the district court corrected inconsistent answers to special interrogatories, but Wavelinq's authorities are clearly distinguishable. In G.A. Thompson & Co. v. Partridge, a district court entered judgment for approximately $120,000 against four defendants jointly and severally when a jury mistakenly awarded approximately $30,000 against each of the defendants.[15] Other situations with courts altering verdicts generally occur when the jury reduces a damage award based on negligence attributed to the liable party.[16] We have recognized that the district court "may correct clerical errors in a verdict and must harmonize apparently conflicting verdicts."[17] However, none of these cases permitted a district court to adjust the allocation among different damage categories as Wavelinq argues the district court should have done here.

---

[13] Id. at 547 (citing Alston v. West, 340 F.2d 856 (7th Cir. 1965) and Grober v. Capital Transit Co., 119 F. Supp. 100 (D.D.C. 1954)).

[14] Id. (citing Wells Truckways, Ltd. v. Burch, 247 F.2d 194 (10th Cir. 1957)).

[15] 636 F.2d 945, 963-64 (5th Cir. 1981).

[16] See, e.g., Geosearch, Inc. v. Howell Petroleum Corp., 819 F.2d 521, 528 (5th Cir. 1987) (district court allowed recovery of the full damage award where the jury awarded 55% of uncontested damages against a defendant who was found 45% negligent).

[17] Id. at 527 (citing FED. R. CIV. P. 60(a); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962); and Mercer v. Long Mfg. N.C., Inc., 665 F.2d 61, 65 (5th Cir. 1982)).

More importantly, the district court recognized the jury's confusion when it awarded $5,000,000 in a category in which the parties agreed the maximum amount was $897,773. The district court gave supplemental instructions with an explanation of how to allocate the damages based on each party's arguments and damage models. The district court did not err in refusing to enter the first verdict and resubmitting the matter to the jury for further consideration.

B

JDS challenges the district court's supplemental jury instructions. Because neither party objected to the original jury charge in district court, appellate review is precluded "unless the error is so fundamental as to result in a miscarriage of justice."[18] As JDS objected to the supplemental instructions, our review of the supplemental instructions is for abuse of discretion.[19] "A district court does not abuse its discretion if its instructions, as a whole, state the law correctly and instruct the jury properly on the legal principles to be applied to the facts that they will decide."[20]

The district court discussed the jury's initial verdict, stating there were two logical ways to read it. The jury could have agreed with JDS concerning Wavelinq's failure to prove damages for disputed and undisputed products and intended to award no damages in those categories to Wavelinq. The other possibility was that the jury decided Wavelinq proved its case and intended to award the full $5,000,000 under the damage caps. The district court instructed the jury that if this was the case, the damages would need to be allocated among

---

[18] Farrar v. Cain, 756 F.2d 1148, 1150 (5th Cir. 1985).

[19] Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc., 414 F.3d 546, 550 (5th Cir. 2005).

[20] Id. (citing United States v. Dien Duc Huynh, 246 F.3d 734, 738 (5th Cir. 2001)).

the three categories. The district court specifically pointed the jury to Waveling's damage model and the exhibit that showed the maximum award recoverable for the category covering the earn-out statements. The district court stated that to stay within the $5,000,000 cap, the jury might consider calculating the amounts for undisputed products and earn-out statements, subtracting that number from $5,000,000, and placing the remainder in the disputed products category. The district court explicitly told the jury that "I am not trying to push you in one direction or the other" and that the district court wanted the verdict to be the jury's own.

JDS cites Belton v. Fibreboard Corp., in which we held that the judge invaded the jury's fact-finding function with instructions expressing opinions on damages and encouraging a specific verdict.[21] In Belton, a jury returned an initial verdict, but the district court told them that because the other defendants had settled with the plaintiffs, they would have to make the damage award higher if the plaintiffs were to recover from the nonsettling defendant.[22] The district court asked: "I presume this is the amount that you feel that they should recover from the defendant; is that correct?"[23] We deemed this to be an inappropriate comment on the factual issue of damages.[24] The jury then returned a second verdict, but that verdict still would not have allowed the plaintiffs to recover the full amount the jury had stated in the first verdict when they were under the impression that the plaintiffs' settlement with the other

---

[21] 724 F.2d 500, 505-06 (5th Cir. 1984).

[22] Id. at 506.

[23] Id.

[24] Id.

defendants would not be deducted.[25] At this point, the district court told the jury the amounts of the previous settlements and instructed them to deliberate further.[26] We reversed because it was "clear that the verdict upon which the judgment appealed from was entered did not represent the views of an impartial jury."[27]

However, in Belton, we noted that a district "judge has the right to comment on the evidence, but may not comment on the ultimate factual issues to be decided."[28] Relying on University Computing Co. v. Lykes–Youngstown Corp., we noted that when the district court received the first verdict and concluded that the jury did not understand the charge, the district court would have been "free to ask the jury members whether their verdict was intended to reflect the total amount of the plaintiffs' damages, to reinstruct them, and to allow them to deliberate further."[29] In the present case, the district court's supplemental instructions were significantly more evenhanded than in Belton. The district court presented both plausible explanations for the jury's first verdict and instructed them how to clarify their intent to ensure that they understood the initial charge. The district court also was careful to explain how the jury might use the evidence without commenting on its weight.

---

[25] Id. at 503.

[26] Id. at 503-04.

[27] Id. at 506.

[28] Id. at 505-06 (citing Quercia v. United States, 289 U.S. 466, 470 (1933) and McCullough v. Beech Aircraft Corp., 587 F.2d 754, 761 (5th Cir. 1979)).

[29] Id. at 506 (citing FED. R. CIV. P. 49(b); Univ. Computing Co. v. Lykes–Youngstown Corp., 504 F.2d 518, 547 (5th Cir. 1974); and Stewart v. Atl. Pipe Line Co., 470 F.2d 738 (5th Cir. 1972), modified, 479 F.2d 311 (5th Cir. 1973)).

The district court's supplemental instructions are in line with situations in which a court of appeals has affirmed a district court's supplemental instructions upon resubmission of a verdict. In University Computing Co. v. Lykes–Youngstown Corp., the district court reminded the jury that if it was their intention to find that the plaintiff was not damaged with respect those counts where the jury had awarded punitive but not actual damages, then the jury only needed to return a verdict for the defendants.[30] We approved of those supplemental instructions because they "clearly and properly notif[ied] the jury of its options without making any attempt to sway the jury in its deliberations."[31] Likewise, in Alston v. West, the Seventh Circuit concluded that a district court did not coerce the verdict where the court resubmitted a verdict because the jury's first verdict failed to follow the court's instructions.[32] In the first verdict, the jury found the owner of the automobile that caused an accident liable but not the agent who actually drove the car despite an explicit instruction by the district court that such a verdict was not legitimate.[33] Because the district court made "it plain to the jury that they were the sole judges of the facts," the Seventh Circuit concluded that the district court acted within it discretion.[34] In the present case, the district court made it clear that the jury was the sole judge of the facts by twice telling the jury that they could simply return their first verdict if that was their intent. Given this record, the district court did not

---

[30] Univ. Computing Co., 504 F.2d at 547.

[31] Id.

[32] 340 F.2d 856, 858 (7th Cir. 1965).

[33] Id. at 857.

[34] Id. at 858.

coerce a certain verdict.

JDS complains that the trial court pointed out Wavelinq's exhibits and damage model to the jury when discussing how it might choose to allocate the $5,000,000. But JDS fails to note that this instruction was given in the context of what the jury should do if they found JDS liable and agreed with Wavelinq's presentation. Inherent in these comments is that these exhibits might be useful if the jury agreed with Wavelinq. The district court was merely commenting on the evidence, which is permissible.[35] Accordingly, the district court did not abuse its discretion in giving the supplemental instructions.

## IV

Both JDS and Wavelinq appeal the district court's decision to award Wavelinq $897,773 for the earn-out category. In the second verdict, the jury had awarded $2,750,000 for this category. The district court reduced this amount by granting judgment as a matter of law.

## A

JDS contends that the earn-out agreement does not require JDS to pay Wavelinq any earn-out amount during the pendency of the lawsuit. Although JDS conceded that it owed $897,773 under the initial earn-out statement, JDS moved for summary judgment arguing that no payment was due until the lawsuit concluded. JDS now argues that the district court improperly submitted the question of the earn-out statement to the jury and should have granted its summary judgment motion to not require payment until the lawsuit's conclusion. We review the denial of JDS's summary judgment motion on the earn-out

---

[35] Belton v. Fibreboard Corp., 724 F.2d 500, 505 (5th Cir. 1984).

statements de novo.[36]

Under the earn-out provision of the agreement, JDS was required to provide Wavelinq with a reasonably detailed earn-out statement within thirty days after the end of each year. Wavelinq then had fifteen days to object to the statement. If Wavelinq failed to object, the earn-out statement was accepted, and JDS was required to pay Wavelinq within five business days. JDS argues that because Wavelinq objected to the earn-out statement, the five-day period has not yet expired such that the jury should not have been presented with a question about these statements.

JDS contends that "an unambiguous contract term says that payment is not required while a dispute is pending." The contract does not contain such a provision—the only relevant provision states when payment is due without objection. The district court did not err by denying JDS's summary judgment motion.

B

Wavelinq argues that the district court improperly granted JDS's motion for judgment as a matter of law to reduce the recovery under the verdict for the earn-out category. We review a district court's denial for judgment as a matter of law de novo,[37] finding judgment as a matter of law appropriate when "a party has been fully heard on an issue . . . [and] a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[38]

Wavelinq again argues that the jury intended to award Wavelinq

---

[36] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

[37] Anthony v. Chevron USA, Inc., 284 F.3d 578, 583 (5th Cir. 2002).

[38] FED. R. CIV. P. 50(a).

$5,000,000 and asserts that the jury's intent should trump all other considerations. It is elementary that a verdict must be supported by the evidence, and in this case, the evidence, in addition to the parties' agreement, limited the maximum recovery to $897,773.

V

JDS argues that the evidence is insufficient to support the jury's second verdict, contending that the damage awards have no relation to Wavelinq's damage model. JDS also faults Wavelinq's damage model because it divided the statements into a year-by-year format rather than a claim-by-claim format that would comport with the jury instructions. JDS fails to note that within each year, the models have breakdowns for each type of product, allowing the jury to convert from a year-based calculation to a claim-based calculation.

JDS argues that the line items in the damage model do not comport with the jury's exact awards. For example, the jury awarded 36.44% of disputed product claims and 90.25% of undisputed product claims that Wavelinq sought to prove. Wavelinq retorts that the jury reduced the award in the disputed products category significantly to keep the overall award under the $5,000,000 cap, as instructed by the district court. It is possible under this theory that the jury found that Wavelinq proved damages in excess of the $1,500,000 for disputed products but simply allocated the remaining portion of the $5,000,000 to this blank after calculating the undisputed product and earn-out statement damages. The district court's supplemental instructions suggested this approach to the jury should they find for Wavelinq.

The record is not so devoid of evidence that a reasonable person could not reach the jury's findings. The confusion seemingly resulted from the jury being

instructed to operate under a $5,000,000 cap. Though the verdict may not exactly correspond with Wavelinq's damage model, Wavelinq's model was not restricted by the $5,000,000 cap. With the jury operating under the caps, the verdict is sufficiently based on evidence adduced at trial even though it does not exactly correspond with the Wavelinq model.

JDS also contends that Wavelinq's models are flawed due to improper calculations. Specifically, the returns and discounts subtracted from gross sales were supposed to be determined according to Generally Accepted Accounting Practices (GAAP). We reject this argument because there were no applicable GAAP on the issue of returns and discounts.

JDS also asserts that Wavelinq failed to subtract returned products from the gross sales on their damage model. The record reflects factual disputes, which were for the jury to resolve.

JDS also disputes the additional sales that Wavelinq sought to prove for the undisputed products. JDS complains that Wavelinq did not provide an actual invoice to prove that the unreported sales occurred. Not only did Wavelinq provide documents to support the unreported sales, but Seago also testified at length and in detail of his personal knowledge about these sales.

Accordingly, we conclude that the evidence adduced at trial was sufficient to support the second verdict.

## VI

Finally, JDS contends that the trial court incorrectly applied the Texas prejudgment interest rate instead of the lower Ontario rate after determining that JDS failed to give adequate notice of reliance on foreign law on this issue.

We review the district court's decision on choice of law questions de novo.[39] "Issues regarding pre-judgment interest in a diversity case 'are governed by applicable state law.'"[40] As we have noted earlier, Texas would honor the parties' choice of Ontario law.

Federal Rule of Civil Procedure 44.1 requires that a party "who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." In considering the reasonableness of notice, the court should weigh "[t]he stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised."[41]

JDS asserted from the beginning of the litigation that Ontario law applies to all substantive contract issues, as stipulated in the Asset Purchase Agreement. In multiple briefs and orders, JDS quoted the choice of law clause. However, JDS did not raise Ontario law for the specific issue of prejudgment interest until after the final judgment was entered.

Wavelinq argues that JDS has waived its right to address foreign law by waiting to provide notice on the prejudgment interest question until after the final judgment was entered. Wavelinq cites two cases to support its waiver argument, but in both the party failed to give notice of any foreign law issue.[42]

---

[39] R.R. Mgmt. Co. v. CFS La. Midstream Co., 428 F.3d 214, 221-22 (5th Cir. 2005).

[40] Hall v. White, Getgey, Meyer Co., LPA, 465 F.3d 587, 595 (5th Cir. 2006) (quoting Canal Ins. Co. v. First Gen. Ins. Co., 901 F.2d 45, 47 (5th Cir. 1990)).

[41] FED. R. CIV. P. 44.1 advisory committee's note.

[42] See Frietsch v. Refco, Inc., 56 F.3d 825, 828 (7th Cir. 1995); Thyssen Steel Co. v. M/V Kavo Yerakas, 911 F. Supp. 263, 267 (S.D. Tex. 1996).

21

Because JDS referred to Ontario law since the beginning of the lawsuit, it did not waive its foreign law arguments.

Under Ontario law, prejudgment interest begins accruing the date the cause of action arose and continues to the date of the order.[43] Ontario courts will average the rates over the relevant time period so that recovery is more accurate.[44] Wavelinq argues that Ontario law provides broad discretion to determine the interest rate. The Courts of Justice Act provides Ontario courts with broad discretion in determining the amount of prejudgment interest to be awarded.[45] Citing differences in the currency and economy, Wavelinq argues that these factors weigh heavily in favor of concluding that an Ontario court would apply the Texas prejudgment interest rate.

Since the parties contracted to use Ontario law, it should govern the prejudgment interest rate. Accordingly, we reverse the district court's judgment to the extent it applied Texas prejudgment interest, and we remand so that Ontario prejudgment interest law can be applied.

*       *       *

For the foregoing reasons, we AFFIRM the judgment of the district court in part; REVERSE in part; and REMAND the cause for further proceedings. Each party shall bear its own costs of this appeal.

---

[43] Court of Justice Act § 128(1), R.S.O. 1990, c. C.43 s. 128 (Can.).

[44] Dunlaw Life Ins. Agency Ltd. v. Citadel Life Assurance Co., [2003] O.J. No. 4969, ¶ 10.

[45] Court of Justice Act § 130, R.S.O. 1990, c. C.43 s. 130 (Can.).